J-S36006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NUTTA VERDIER | |
| Appellant | No. 2910 EDA 2016 |

Appeal from the Judgment of Sentence December 19, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008626-2010

BEFORE:  PANELLA, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED SEPTEMBER 11, 2017**

On December 19, 2012, a jury convicted Appellant, Nutta Verdier, of third-degree murder, attempted murder, conspiracy to commit murder, aggravated assault, and crimes arising from his possession of a firearm. In this *nunc pro tunc* appeal,[1] he raises seven challenges to the judgment of sentence entered by the trial court. After careful review, we affirm.

This Court has previously addressed the direct appeals of Verdier's co-conspirator turned Commonwealth witness Jacque Warren and Verdier's co-defendant, Eric Cooper. We refer the reader interested in a detailed factual history of this crime to those memoranda. ***See Commonwealth v. Warren***,

_____

[1] Verdier's initial direct appeal to this Court, in 2013, was dismissed when his appellate attorney failed to file a brief in the matter. A PCRA court reinstated Verdier's direct appeal rights, and this appeal followed.

3332 EDA 2012 (Pa. Super., filed May 22, 2014) (unpublished memorandum), and **Commonwealth v. Cooper**, 1268 EDA 2013 (Pa. Super., filed August 28, 2015) (unpublished memorandum), *appeal denied* 134 A.3d 54 (Pa. 2016) (Table).

We first address Verdier's contention that the evidence at trial was insufficient to support his conviction for third-degree murder.[2] Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. **See Commonwealth v. Dale**, 836 A.2d 150, 152 (Pa. Super. 2003). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Bruce**, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." **Id**. (citation omitted). Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. **See id**. "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." **Commonwealth v. Kinney**, 863

---

[2] We have re-ordered Verdier's issues for readability purposes.

A.2d 581, 584 (Pa. Super. 2004) (citation omitted). Therefore, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." **Bruce**, 916 A.2d at 661 (citation omitted).

As noted, Verdier's challenge concerns his conviction for third-degree murder, which is an unlawful killing with malice, but without the specific intent to kill. **See** 18 Pa.C.S.A. § 2502(c). **See also Commonwealth v. Santos**, 876 A.2d 360, 363 (Pa. 2005); **Commonwealth v. DiStefano**, 782 A.2d 574, 582 (Pa. Super. 2001). Malice is defined as

> a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured....["] [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

**Id**. (quoting **Commonwealth v. Cottam**, 616 A.2d 988, 1004 (Pa. Super. 1992) (brackets in original)). Additionally, the finder of fact may infer malice by considering the totality of the circumstances. **See Commonwealth v. Thomas**, 656 A.2d 514, 516 (Pa. Super. 1995).

Verdier argues that the evidence at trial was insufficient to permit the application of the doctrine of transferred intent. Under the doctrine of transferred intent, the intent to murder may be transferred where the person actually killed was not the intended victim. **See** 18 Pa.C.S.A. § 303(b)(1); **Commonwealth v. Gaynor**, 648 A.2d 295, 298 (Pa. 1994).

He contends that at trial: (1) co-conspirator Warren testified that "GoGo"[3] shot the murder victim, Gary Autry; (2) Warren further testified that "GoGo" was using a .40 caliber pistol; (3) forensic evidence established that the fatal wounds suffered by Autry were caused by a .40 caliber pistol; (4) Warren testified that Verdier utilized a 9mm pistol; and (5) that all the testimony established that Verdier fired his weapon in the opposite direction from Cobb. Thus, he argues that the Commonwealth presented insufficient evidence to establish "reckless intent" towards Cobb. Appellant's Brief, at 25.

In addressing Verdier's argument, it is important to remember that he was convicted of third-degree, not first-degree, murder. As set forth above, third-degree murder does not require a specific intent to kill. Thus, the doctrine of transferred intent is not relevant to the conviction. All the Commonwealth was required to prove was that Verdier acted with "recklessness of consequences … although a particular person [was] not intended to be injured."

With this in mind, we conclude that the evidence at trial was sufficient to support Verdier's conviction for third-degree murder.[4] Warren drove

---

[3] "GoGo" was the nickname of Caliph Douglas.

[4] The certified record received by this Court did not contain any of the transcripts relevant to this case. It is an appellant's responsibility to ensure the certified record contains all the items necessary to review his claims. ***See***, ***e.g.***, ***Commonwealth v. Tucker***, 143 A.3d 955, 963 n.3 (Pa. Super. 2016); ***Commonwealth v. B.D.G.***, 959 A.2d 362, 372 (Pa. Super. 2008). *(Footnote Continued Next Page)*

Verdier, Eric Cooper, and "GoGo" in a van to an intersection in the city of Philadelphia with the desire to confront Darrel Cobb, with whom they had engaged in a firefight approximately a week before. *See* N.T., Jury Trial, 10/4/12, at 127, 139. Verdier told Warren that he "was going to do something to Darrell Cobb before Darrell did something to him[.]" *Id*., at 158-159.

Warren originally testified that upon arriving at the intersection, he and Verdier exited the van and approached Cobb. *See id*., at 149. "GoGo" and Cooper remained in the van. *See id*. As Warren and Verdier approached Cobb, Warren testified that Cobb drew a firearm on them. *See id*., at 150. Warren ran back to the van, while Cobb and Verdier exchanged shots at each other. *See id*.

Cooper left the van to help Verdier with Cobb. *See id*., at 151. "GoGo" remained in the van, and began firing in the opposite direction. *See id*., at 152. Warren testified that "GoGo" fired at bystanders on the street, including the murder victim, believing that they were associates of Cobb. *See id*., at 155. Police found evidence that the trio fired at least 27 shots during the shootout. *See* N.T., Jury Trial, 10/3/12, at 123.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

"When a claim is dependent on materials not provided in the certified record, that claim is considered waived." *Commonwealth v. Petroll*, 696 A.2d 817, 836 (Pa. Super. 1997) (citation omitted). Despite the dictates of *Commonwealth v. Preston*, 904 A.2d 1 (Pa. Super. 2006) (*en banc*), we ordered the transcripts from the trial court to allow review of Verdier's claims.

We have no difficulty in determining that, given this evidence, the jury was entitled to find that Verdier acted with a complete disregard of the high risk that his actions in pursuing his vendetta against Cobb would cause significant bodily injury to any number of innocent bystanders in the area. Verdier is due no relief based on his claim of insufficient evidence to support his conviction for third-degree murder.

Next, he argues the trial court erred in failing to declare a mistrial due to allegations the Commonwealth improperly indirectly influenced Warren's testimony. Warren started testifying on the afternoon of Thursday, October 4, 2012. While testifying, Warren denied that he knew that Verdier, Cooper, or "GoGo" were armed before Cobb drew his firearm. **See** N.T., Jury Trial, 10/4/12, at 137, 139-140. Warren's testimony was suspended for the evening on Thursday, and scheduled to resume the following Tuesday morning.

The prosecutor felt Warren's testimony contradicted his previous statement to the police.[5]  In response, she contacted Warren's criminal defense counsel over the weekend and informed him that she did not like

_____

[5] There is no sworn testimony in the record concerning the actions taken by the prosecutor between the end of Warren's testimony on Thursday afternoon and its resumption on Tuesday morning, merely sidebar discussions between counsel and the trial court. However, the Commonwealth agreed to a stipulation that contained the essential facts.

Warren's testimony. Warren's attorney communicated the prosecutor's opinion to Warren before he resumed testifying on Tuesday morning.

Prior to the resumption of cross-examination of Warren, Verdier and his co-defendant, Cooper, learned of the weekend communiques between the prosecutor, Warren's attorney, and Warren. They immediately moved for a mistrial, asserting that the prosecutor had violated the sequestration order that the trial court had entered when Warren's testimony was suspended on Thursday afternoon. The trial court, at sidebar, questioned Warren's counsel, "did you in fact do anything that could be called "prompting" or – ." N.T., Jury Trial, 10/9/12, at 30. Counsel replied, "To change the facts, no I didn't." *Id*.

Following a sealed discussion at sidebar, the trial court resumed questioning Warren's counsel: "Now, given that – now, this morning, you [Warren's counsel] wanted to talk to [Warren] some more this morning?" *Id*., at 31. The trial court and Warren's counsel then discussed the possibility that Warren may attempt to assert his Fifth Amendment right not to testify.

Verdier's counsel then renewed his motion for a mistrial, asserting that Warren "has been given a report card that he has flunked up to this point.

He's not going to get his deal. He's going to have to change his testimony."[6] *Id*., at 32. The trial court indicated that it would not grant a mistrial, "for the reasons that I've already said." *Id*., at 33. The trial court then elaborated on its reasoning, noting that there was no way to return the genie to the bottle: Warren's future testimony in any new trial could still be guided by the "report card" given by the prosecutor.

Warren was then examined by the defense, outside the presence of the jury, on whether anything that had happened over the weekend would affect his testimony going forward. He denied that anything had, while acknowledging that he had spoken to his mother about topics other than the trial.

Cross-examination of Warren in front of the jury resumed after some further sidebar discussion that is irrelevant to the issue before us. Warren testified that he was "trying to help [Verdier] by saying he was out there firing in self-defense[.]" N.T., Jury Trial, 10/9/12, at 68.

_____

[6] Our review of the transcripts has not revealed an explicit admission that Warren had an agreement with the Commonwealth. Warren himself repeatedly denied that he had any form of deal with the Commonwealth, while admitting that he was hoping that his sentence would be reduced. *See*, *e.g.*, N.T. Jury Trial, 10/9/12, at 57-58. Given the arguments of the parties and statements of the trial court in the transcript before us, it is clear that Warren was, to some extent, cooperating with the district attorney's office and had some expectation that his previously vacated sentence could be reduced upon re-sentencing if he curried favor with the district attorney.

On re-direct, the prosecutor asked Warren if he knew his colleagues had firearms before they got into the van. Contrary to his testimony on the previous Thursday, Warren testified that he did. *See id*., at 101. When asked how he knew, he stated that he had seen the firearms. *See id*., at 101-102.

At this point, another sidebar was held. Both defense counsel argued that the change in Warren's testimony had now made relevant the entirety of the conversations between the prosecutor, Warren's counsel, and Warren. Verdier's counsel recounted the conversation he had with Warren's counsel earlier in the morning:

> And then when [Warren's counsel] and I had a discussion this morning regarding his conversation with the District Attorney, … that she was calling [Warren's counsel] and telling him that this guy basically messed himself up. And I asked him, Did you tell your client that? Yes.
>
> [Warren's counsel] told you this morning that 15 percent of the conversation dealt with what he had said or didn't say. [Warren's counsel] discussed with me specifically the area that had been addressed to him was that the witness had denied knowing that they had brought guns to the car, and now this is the very question that the DA asks.

*Id*., at 107-108. The trial court then asked the prosecutor whether she had told Warren's counsel that she was "disappointed with the testimony or the witness had messed up because he said he didn't know that the people in the van had guns before they got – when they got in the van?" *Id*., at 108-109. The prosecutor denied that she discussed specifics with Warren's

counsel, but admitted that she had indicated she was not pleased with Warren's testimony on the previous Thursday.

Warren's counsel indicated that he did not agree with the prosecutor's rendition of the conversation, and the trial court once again sealed the transcript. *See id*., at 110. When the unsealed transcript resumes, the prosecutor is arguing that her re-direct examination had not exceeded the scope of cross-examination. *See id*., at 111.

The sidebar argument continues for several more pages, leading to the trial court's suggestion that a stipulation be read to the jury. *See id*., at 118. The trial court desired the stipulation, as it did not want either the prosecutor or Warren's counsel to be called to testify before the jury. *See id*., at 123.

The parties proceeded to debate the content of the proposed stipulation, resulting in the following suggestion by the trial court:

> Why don't we – maybe there could be a stipulation … when the witness … made a statement to the District Attorney about what he would testify to … if he was called in this case, one of the things he said was that he knew that all three of the gentlemen in the van other than himself had guns when they got in the van.
>
> …
>
> That based on that, the District Attorney called him as a witness to, among other things, testify to that fact.
>
> …
>
> That he failed to so testify on Thursday, and the District Attorney reported this to the witness's lawyer; that the witness's lawyer had a conversation with the witness in which he pointed this out

- 10 -

to him … and indicated that it might affect his ability to change his sentence with Judge Minehart.

*Id*., at 127-128. Verdier's counsel indicated his satisfaction with this stipulation, while Cooper's counsel requested an opportunity to confer with Verdier's counsel before making a decision. ***See id***., at 128.

Upon returning from his conference with Verdier's counsel, Cooper's counsel indicated that the stipulation was insufficient for his purposes. Cooper's counsel indicated that he was not satisfied with the stipulation, and that he required a "Sixth Amendment right of confrontation of the witness." *Id*., at 130. Verdier's counsel noted that he saw Cooper's counsel's "point about the confrontation of the witness, that I would like to – I know the witness cannot be asked about any conversation that the District Attorney had with us or that she had with [Warren's counsel,] but he can be … questioned about the conversation." *Id*., at 131. Ultimately, the trial court agreed, and ruled that defense counsel could question Warren pursuant to those limitations. ***See id***., at 132-133.

After further sidebar argument and private discussions between defense counsel, the parties agreed to the stipulation, so long as defense counsel could question Warren on how his conversation with his counsel over the weekend had impacted his testimony. ***See id***., at 139-141. Verdier's counsel consented to this procedure. ***See id***., at 145. The trial court presented the following stipulation to the parties:

> Over the weekend, the District Attorney spoke to the witness's lawyer and told him that she was dissatisfied with the witness's testimony because he testified that he didn't see anyone get in the van with a gun, whereas during trial preparation and in a pretrial interview he had stated that all three men had guns when they got in the van. The witness's attorney then communicated this to the witness and indicated to him that this might affect further proceedings before Judge Minehart.

*Id*., at 146. Verdier's counsel again agreed with this procedure. ***See id***.

Verdier's counsel then proceeded to finish examination of Warren. Warren once again changed his testimony, stating that his testimony on Thursday was correct, and that he was not aware of the guns until his accomplices had exited the van and the firefight began. ***See id***., at 151. He denied being aware of the guns when the group initially entered the van. ***See id***.

Verdier's counsel rested, and the trial court then instructed the jury as follows:

> Members of the jury, counsel have entered into a stipulation. And you remember that I believe I told you last week that a stipulation is a fancy word for agreement. And when counsel have agreed to something, you have to accept it as a fact. Ordinarily, the jury decides what the facts are. But when counsel agree that something is a fact, you have to accept that as a fact.

> Counsel have agreed on the following: Over the weekend, the Assistant District Attorney spoke to the witness's lawyer and told him that she was dissatisfied with the witness's testimony because he testified that he didn't see anyone get in the van with a gun, whereas in trial preparation and in a pretrial interview, he had stated that all three men had guns when they got in the van. The witness's attorney than communicated this to the witness and indicated to him that this might affect further proceedings before Judge Minehart.

*Id*., at 154-155. No party objected to this instruction. *See id*., at 155.

On appeal, Verdier raises two arguments against the trial court's handling of this issue. First, he contends that the prosecutor's actions constituted a violation of the trial court's sequestration order that directed Warren to abstain from discussing the case with anyone over the weekend. Essentially, Verdier argues that the prosecutor knew or should have known that her phone call to Warren's counsel would lead to counsel discussing the case with Warren, thereby violating the sequestration order.[7]

The power to sequester witnesses is discretionary with the trial court, subject to limitations not relevant here. *See* Pa.R.E. 615. Verdier contends that the trial court abused this discretion by finding that there was no violation of the sequestration. However, we conclude that while the trial court did not make an explicit finding that the sequestration order was violated, it clearly found that a violation had occurred.

As set forth above, when Verdier brought the prosecutor's actions to the trial court's attention, an extended sidebar discussion ensued. In this discussion, the trial court discussed the appropriateness of various remedies, ultimately settling upon a multi-part remedy. Thus, Verdier's challenge is more aptly classified as a challenge of the remedy chosen by the trial court.

_____

[7] Warren's counsel was not present for Warren's testimony on Thursday or for the court's sequestration order. Instead, he was working for another client at the time. *See* N.T., Jury Trial, 10/9/12, at 117.

Even after a trial court concludes that its sequestration order has been violated, it retains discretion in selecting a remedy. ***See Commonwealth v. Robertson***, 874 A.2d 1200, 1209-1210 (Pa. Super. 2005). On appeal, Verdier argues that, under the circumstances, the trial court was required to either declare a mistrial, or strike Warren's testimony.

Verdier never requested that the trial court strike Warren's testimony. It is unsurprising that Verdier did not make such a request, as Warren's initial relevant testimony was favorable to the defense. In any event, we cannot fault the trial court for failing to grant a remedy the defense did not request, and that may have ultimately harmed the defense.

We therefore turn to the remedy that Verdier requested and the trial court refused. Verdier requested a mistrial when he raised the violation of the sequestration order with the trial court. In refusing to grant a mistrial, the trial court noted that the issue arose in the middle of a multi-day trial, incurring costs for all parties. Furthermore, the court observed that, at a new trial, Warren would still have the benefit of knowing the prosecutor's opinion on the appropriateness of his testimony. Thus, there were significant costs attached to declaring a mistrial, and no apparent benefit.

Our review of the record indicates that the trial court was placed in a difficult position by the prosecutor's actions in the middle of a murder trial. Far from Verdier's characterization in his appellate brief, the trial court engaged in a protracted and thoughtful attempt to resolve the issue in a just

manner. The remedy imposed by the court brought the violation of the sequestration order before the jury as an incontrovertible fact. Furthermore, defense counsel were able to utilize this incontrovertible fact in their closing arguments attacking the credibility of Warren. This remedy is quite likely the best possible resolution of the issue under the circumstances. As such, we cannot conclude that the remedy constituted an abuse of the trial court's discretion, and no relief is due.

Next, Verdier argues the remedy violated his Sixth Amendment right to confront his accuser. "The substance of the constitutional protection [contained in the Sixth Amendment] is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him the ordeal of a cross-examination." ***Crawford v. Washington***, 541 U.S. 36, 57 (2004) (citation omitted). Verdier argues the trial court violated his confrontation rights when it denied him the opportunity to call Warren's counsel and the prosecutor to testify before the jury. He believes the indirect communications between the prosecutor and Warren's counsel were relevant grounds for impeachment of Warren at trial.

The Commonwealth correctly asserts Verdier's initial objection was not premised upon confrontation concerns. Rather, his argument was based upon a violation of the sequestration order. Thus, there is some support for the Commonwealth's contention this argument is waived.

A close review of the available transcripts of the sidebar discussions reveals that Verdier did explicitly join Cooper's initial confrontation clause objection to the proposed stipulation. *See* N.T., Jury Trial, 10/9/12, at 130. However, this objection was premised upon the right to confront Warren on the issue, not on the right to examine Warren's counsel or the prosecutor. *See id*., at 131. The trial court permitted Verdier to examine Warren on the impact of the sequestration violation on his testimony. *See id*., at 133. To the extent Verdier explicitly requested an opportunity to question Warren's counsel following his confrontation clause objection, his request was conditioned on the possibility that Warren might deny that he remembered the conversation with his counsel. *See id*.

Ultimately, this condition did not come to pass, as Verdier rested before questioning Warren on his weekend conversation with his counsel. Indeed, the issue was somewhat mooted as Warren subsequently testified that he was unaware that his compatriots were armed. *See id*., at 151. This testimony conformed to his initial testimony from Thursday. Verdier did not subsequently object or otherwise request an opportunity to examine Warren's counsel.

Based upon this record, we conclude that to the extent Verdier raised a confrontation clause issue before the trial court, the court granted him the relief he requested. He was permitted to examine Warren on the effect of his weekend conversation with his counsel, even though he subsequently did

not capitalize on this permission. Since he did not question Warren on the issue, his admitted condition for questioning Warren's counsel did not come to pass. He therefore received the requested right to confront witnesses against him. As such, no relief is due on appeal.

In his next issue, Verdier contends that the verdict was against the weight of the evidence presented at trial. Specifically, Verdier challenges the credibility of the Commonwealth's two primary witnesses: Warren and Cobbs. He highlights their criminal felony records in this attack.

"[W]e may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003) (citations omitted). A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004) (citations omitted).

While Warren and Cobbs clearly had credibility issues, we cannot rule that they were categorically incapable of testifying credibly. Defense counsel attacked the credibility of each witness thoroughly and professionally. The jury chose to believe them anyway. The trial court found the verdict did not

shock its sense of justice. We find no abuse of discretion with this conclusion.

Next, Verdier argues that the trial court erred in its treatment of the prosecutor's discovery violations regarding fingerprint and ballistic analyses. Verdier's Rule 1925(b) statement was too vague to alert the trial court to his ballistics analysis issue. As a result, the court did not address the issue, and we are without the benefit of its analysis. We therefore conclude that this issue is waived. *See Commonwealth v. Freeman*, 128 A.3d 1231, 1248 (Pa. Super. 2015).

The trial court did address Verdier's argument concerning fingerprint analysis. When investigators swept the van for fingerprints, the only fingerprints found were Warren's. The prosecutor did not disclose the results of scientific testing[8] pre-trial.

During the direct examination of Officer John Taggart, the prosecutor asked whether fingerprints had been lifted from the van. *See* N.T., Jury Trial, 10/4/12, at 80. Officer Taggart indicated that he had lifted four fingerprints from the van and sent them to be tested. *See id*. He did not testify to the results of the testing. *See id*.

_____

[8] The Commonwealth must disclose the results of scientific tests if the defense requests it. *See* Pa.R.Crim.P. 573(B)(1)(e). The Commonwealth conceded that defense counsel made such a request in this case. *See* N.T., Jury Trial, 10/4/12, at 100.

At the close of direct examination of Officer Taggart, defense counsel requested a sidebar. At the sidebar, counsel notified the trial court that the Commonwealth had failed to disclose the results of the testing on the fingerprints taken from the van. *See id*., at 84. Counsel did not make any explicit request for sanctions. *See id*.

The trial court found that the Commonwealth had failed to comply with its disclosure obligations, but indicated that it was not prepared to declare a mistrial based upon the circumstances before it. *See id*., at 92. However, it provided that "[i]f it turns out that something has happened that would interfere with [the ability to proceed with the trial,] then we'll have to discuss it at that time." *Id*. In other words, the court was willing to entertain a motion for a mistrial, but only if defense counsel could establish sufficient prejudice.

Verdier does not identify any point in the voluminous transcripts where he explicitly advocated for a specific remedy for this discovery violation. And our review of the transcripts has not located any such request. Ultimately, two separate stipulations were read to the jury on the issue. First, the prosecutor told the jury that parties had stipulated that

> there was [sic] two fingerprints, two latent prints[.] They were taken from the right front interior window of [the van.] Those prints from the passenger front interior window were positively identified as being from Jacque Warren. They were also checked against the defendant, Nutta Verdier, with negative results. And they were check against the defendant, [Cooper,] with negative results.

- 19 -

N.T., Jury Trial, 10/10/12, at 242. The next day, Verdier's trial counsel read the following additional stipulation to the jury:

> The first stipulation deals with the fingerprints that you heard testified to yesterday, specifically as to where fingerprints were found in the van on the passenger side window.
>
> The date that report was first received by the District Attorney and then given to us was this past Tuesday, October the 9th. That's when we all found out the results of those fingerprints.

N.T., Jury Trial, 10/11/12, at 37-38.

Verdier's trial counsel did not voice any objection to the appropriateness of these stipulations. He used these stipulations to argue to the jury that the Commonwealth, unaware of the results of the fingerprint testing, had prematurely decided to believe Warren's version of events. He further argued that based upon the results, Warren was falsely implicating Verdier to protect himself from prosecution. *See id*., at 76-78.

In his appellate brief, Verdier argues that the trial court abused its discretion by failing to consider whether the prosecutor had acted in bad faith. However, as noted, the trial court informed defense counsel that if they had argument or evidence regarding aggravating circumstances, it would consider sanctions. Verdier does not identify any such argument or evidence, and our review has come up empty. As also noted above, Verdier's counsel did not make any explicit requests for sanctions or a continuance. Thus, Verdier's appellate issue is arguably waived. To the extent that it is preserved, we conclude that he has failed to establish that he suffered any

prejudice from the discovery violation, or that the trial court's handling of the issue constituted an abuse of discretion. No relief is due.

In his next issue, Verdier provides a one paragraph argument, seeking to incorporate by reference an issue raised in his prior direct appeal. As such, Verdier's legal argument is wholly undeveloped. It contains no citations to legal authority or to the record before us. **See** Pa.R.A.P. 2119(b), (c). Therefore, the claim is waived. **See Moses Taylor Hosp. v. White**, 799 A.2d 802, 804 (Pa. Super. 2002) ("When an appellant attempts to incorporate by reference issues addressed elsewhere and fails to argue them in his brief, the issues are waived."). No relief is due.

In his final issue on appeal, Verdier asserts that the trial court abused its discretion by failing to consider Verdier's age when it imposed sentence. He concedes that this is a challenge to the discretionary aspects of his sentence. **See** Appellant's Brief, at 33. However, this challenge is waived, as Verdier has not complied with Pa.R.A.P. 2119(f), and the Commonwealth has objected to this failure. **See** Appellee's Brief, at 20. Thus, we do not have jurisdiction to review this issue. **See Commonwealth v. Karns**, 50 A.3d 158, 166 (Pa. Super. 2012).

As none of Verdier's issues on appeal merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/11/2017